IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

VICTOR V. DAVIS,                *

      Plaintiff,           *

        v.               *          Civil Action No. RDB-12-1009

BALTIMORE HEBREW      *
CONGREGATION,
                         *

      Defendant.        *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

This is an employment discrimination case in which the Plaintiff Victor V. Davis asserts claims against the Defendant Baltimore Hebrew Congregation pursuant to 42 U.S.C. §§ 1981, 1982 & 1983; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*; as well as state law claims for breach of contract and wrongful discharge. Pending before this Court is Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment ("Motion") (ECF No. 14). The parties' submissions have been reviewed and no hearing is deemed necessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons that follow, Defendant's Motion (ECF No. 14) is GRANTED in all respects, except as to Defendant's request for attorneys' fees and costs.

## BACKGROUND

This Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Plaintiff, Victor V. Davis, is an African-American resident of Baltimore County, Maryland. Compl. ¶¶ 1, 14,

ECF No. 1. The Defendant, Baltimore Hebrew Congregation ("BHC"), is a synagogue in Baltimore, Maryland. *Id.* ¶ 2. Beginning in 1998, the Plaintiff was employed by BHC as an Associate Facilities Manager, and was eventually promoted to Facilities Manager. *Id.* ¶ 4. Davis's job summary stated that he had "[d]irect responsibility for all maintenance, repair, custodial and janitorial aspects of the Temple building, other facilities and grounds, including electrical, plumbing, carpentry, cabinet work, painting, purchasing material and supervising staff." Pl.'s Opp. Ex. 6, ECF No. 15-7. The Plaintiff was supervised by BHC's Executive Director, JoAnn Windman. Deposition of Victor V. Davis 127, ECF No. 15-3.

The Plaintiff alleges that he worked without any major issues until April of 2009, but this contention is not borne out by the record. Davis attended weekly staff meetings in which Windman frequently had to inform him of jobs that had been assigned to him but were not completed in a timely manner. Deposition of JoAnn Windman 16-17, ECF No. 15-4; Davis Dep. 108-10. Davis acknowledges that he was informed of outstanding work issues in meetings, but states that, upon receiving notice, he completed all jobs. *See, e.g.*, Davis Dep. 185-93.

As Facilities Manager, Davis initially had the authority to make schedules for maintenance personnel, but that responsibility was taken away from him in October 2008, about one year before his termination. Davis Dep. 57; Windman Dep. 9, 28, 54. Thereafter, Davis still had responsibility to ensure that maintenance jobs had adequate coverage by working directly with administrative employee Fred Rahming, an African-American, who took over the scheduling. Deposition of Fred Rahming Dep. 13-15, ECF No. 15-8; Windman Dep. 14-15. The Plaintiff also had the power to purchase materials on behalf of

BHC, but lost that authority in October of 2008. Davis Dep. 96-97; Windman Dep. 53. Windman stated that Davis failed to comparison shop and overpaid for an expensive item, but Davis denies this. Windman Dep. 28, 52-54; Davis Dep. 97, 116-17. From that point forward, the Plaintiff was required to get permission from another BHC employee, Francie Gill, to make purchases. Davis Dep. 97-98; Windman Dep. 29, 38. Windman stated that part of the reason for taking scheduling and purchasing responsibilities away from Davis were to free up time for him to complete his maintenance work. Windman Dep. 53-54. Davis's work performance did not improve. *Id.*

The Plaintiff also had issues with maintaining proper communication in the workplace. During the course of the Plaintiff's employment, it was often necessary for BHC to relay work orders to Davis by contacting him on his cell phone. Windman Dep. 21-22. Davis alleges that he always responded when contacted by telephone, *see, e.g., id.* at 101, but Windman testified that he frequently did not. Windman Dep. 22-24. Evidence shows that after Davis's termination, BHC discovered that at least some voicemails from BHC to Davis were never opened and thus could not have been heard. Windman Dep. 66-67. Furthermore, the Plaintiff acknowledges that he failed to give proper notice and make sure that there was enough maintenance staff coverage when he took vacation in September 2009. Davis Dep. 123-24, 202-04. He concedes that it was a legitimate BHC policy not to allow vacation during the High Holidays.[1] *Id.* Davis also alleges that the maintenance staff was targeted by BHC's "use-it-or-lose-it" vacation policy, but stated that he did not know

---

[1] According to Windman, the Jewish High Holidays, of High Holy Days, are Rosh Hashanah, Yom Kippur, Sukkot, and Simchat Torah. Windman Dep. 51. The dates of these observances follow the Jewish calendar, but usually fall in September and October. *Id.*

whether that policy also applied to employees outside the maintenance department. Davis Dep. 118-21, 246-49.

With regard to personal interactions, there were numerous reports of the Plaintiff being disrespectful toward other staff. Davis Dep. 242-43; Windman Dep. 60-62. Davis acknowledges that complaints were received by Windman and relayed to him. Davis Dep. 242-43. In addition, under the Defendant's policies, the Plaintiff was subject to an annual performance evaluation. Davis Dep. 132-50. He completed his portion of the evaluation for fiscal year 2005, but refused to do so in all other years of employment at BHC, despite repeated reminders. Windman Dep. 11-12, 20.

Another issue arose when the Plaintiff did not provide his driver's license and auto insurance information upon the Defendant's request. Because part of the Plaintiff's work responsibilities involved driving between the Temple and BHC's two cemeteries to work on the gatehouses there, BHC stated that this information was necessary to ensure adequate insurance coverage and that it would pay the difference if the Plaintiff's premium increased. Windman Dep. 50-51. The Plaintiff did not provide the requested information because he objected to giving personal information that would allow BHC to contact his insurer and alert the insurer that he was using his personal vehicle for work purposes. Davis Dep. 111-14, 184-85. Davis alleges that he eventually provided his driver's license information and proof of insurance, but continued to object to providing certain insurance information because he did not want BHC to contact his insurer. Davis Dep. 183-85. Windman states that Davis provided his driver's license information just before he was terminated. Windman Dep. 10-11.

With regard to the Plaintiff's allegations of race discrimination, he alleges that BHC was run like a "plantation," with white employees in administrative positions and African-Americans in maintenance. Davis Dep. 254-57. Davis further alleges that BHC was like a plantation in that maintenance staff was required to serve lunch to the administrative staff. Compl. ¶ 4. The evidence reveals that there were African-American employees who worked in both maintenance and administrative jobs, and that the practice of certain employees serving food to others ended in 2002. Davis Dep. 254-57; Windman Dep. 31-33; Pl.'s Opp., ECF No. 15-1 at 8. The Plaintiff also alleges that he overheard Carol Caplan, a non-employee member of the Congregation, call the maintenance staff "darkies." Compl. ¶ 14. This occurred "between twelve and eighteen months" before his termination. Davis Dep. 260-61. The Plaintiff did not report this incident to anyone at BHC. *Id.* at 273-74.

While on the job at BHC, Davis sustained injuries that he asserts give rise to disability discrimination claims. In 2003, he injured his shoulder in a fall from a ladder. Davis Dep. 24-33. He filed a claim for Workers' Compensation for the shoulder injury and received benefits. *Id.* Then, in April 2009, Davis sustained an injury to his lower back while moving a bookcase. Compl. ¶¶ 5, 7; Davis Dep. 33-38. He alleges that BHC's controller David Weiss attempted to discourage him from filing a Workers' Compensation claim. Compl. ¶¶ 6-7, 28-29; Davis Dep. 234-36. The Plaintiff alleges that he was afraid that if he filed a Workers' Compensation claim, he would be fired in retaliation. Compl. ¶ 6. Nevertheless, he filed a claim and received benefits. Davis Dep. 33-34. He underwent fusion surgery on his spine. *Id.* at 41-42.

When Davis returned to work following his back injury, his doctor limited him to

light work.  Davis Dep. 55-58.  He alleges that he requested that another maintenance employee work with him at all times, but BHC did not provide this accommodation, forcing him to work alone even though he needed help.  Compl. ¶¶ 8-9.  BHC denies that Davis requested any accommodations.  Windman Dep. 16.  Despite having lost scheduling authority, Davis retained a certain amount of control over the schedule and further had the ability to assign another worker to help him with heavy lifting.  Davis Dep. 39-41; Windman Dep. 14-15.

The events that led directly to Davis's termination occurred in the fall of 2009.  As part of his duties, Davis was required to construct a Sukkah, a structure used in celebrating the Sukkot holiday.  Compl. ¶ 12-13; Davis Dep. 153-174.  At times, students from BHC's religious school would ask Davis questions about the Sukkah, and he explained to the children how it was built.  Davis Dep. 154.  He also explained the religious significance of the Sukkah, to the extent of his "limited knowledge."  *Id.*  The wood used to construct the Sukkah needed to be replaced from time to time, but Davis did not have the authority to make the required purchases himself.  Compl. ¶ 12-13; Windman Dep. 37.  The Plaintiff alleges that he had informed BHC of the need to acquire additional lumber, but none had been purchased.  *Id.*  Consequently, the Sukkah was built smaller than required because the Plaintiff alleges that it would have been unsafe to build it to full size.  *Id.* ¶ 12.  Windman instructed the Plaintiff to rebuild the Sukkah to the desired size, but he did not complete this task.  Windman Dep. 8-10.  Davis alleges he was blamed for the actions of a white Jewish maintenance employee, Michael Kogan, who misplaced parts and set up the Sukkah too small.  Davis Dep. 263-64.

On October 5, 2009, the Defendant terminated the Plaintiff. *Id.* ¶ 10. BHC sent Davis a letter which stated, "Unfortunately, reasons have developed over the past several months, more so over the last several weeks, and especially over the last several days which leave [ ] no choice . . . to terminate your employment as Facility Supervisor." *Id.*, Ex. 1. Specifically, BHC stated that it dismissed Davis for the following reasons:

-Failure to cooperate with the Executive Director in making it possible to support the work at the cemetery gate houses that had to be done over the summer (e.g. sharing drivers license information; insurance information.)

-Failure to interactively work out some way that the jobs at the gate houses could be done that was satisfactory to the BHC. These were two recent and very important projects.

-Inability and/or unwillingness to treat staff with a minimum satisfactory level of respect.

-Park Heights Day School Sukkah was set up, full size, by school students with the help of two maintenance [workers] on September 22.

-Without communication to the Executive Director or the Facility/Event Coordinator you took it upon yourself to make Park Heights Sukkah smaller.

-In a memo to you of October 1, along with voice mail messages on your cell phone and on your work voice mail, you were instructed to rebuild the Park Heights Sukkah to full size and when checked it was only 3/4 its full capacity size, thereby failing to handle the assignment before leaving for the day.

-In the same October 1 memo you were instructed, by end of day October 2, to erect the Sukkah on the Day School playground which was never done and again there was no communication to the Executive Director or the Facility/Event Coordinator as to why.

-You failed to have proper staff coverage on Friday, October 2, another major Jewish holiday, despite knowing that two maintenance employees had called out, and again you neglected to inform the Executive Director or the Facility/Event Coordinator. This is a breach of your responsibility as a supervisor.

The points made above appear to be reckless conduct on your part. There is a sense and level of non cooperation and gross negligence of your duties.

Your extensive controlling conduct without apparent justification and without prior approval from the Executive Director is inexcusable and unacceptable.

Letter of Oct. 5, 2009 Re: Termination of Employment from Baltimore Hebrew Congregation, Compl. Ex. 1, ECF No. 1-1.

The Plaintiff filed a charge with the Equal Employment Opportunity Commission and the EEOC issued him a right to sue letter, exhausting his administrative remedies. ECF No. 1-2. Davis then filed a seven-count[2] Complaint in this Court, asserting various federal and state claims based on allegations that the Defendant discriminated against him because of race and disability, failed to provide him with reasonable accommodations, and retaliated against him for filing a Workers' Compensation claim. *Id.* ¶ 14.

ANALYSIS

**I.    The Ministerial Exception**

As an initial matter, this Court addresses the Defendant's argument that all of the Plaintiff's claims are barred by the First Amendment. The Supreme Court recently held for the first time that the Religion Clauses of the First Amendment create a "ministerial exception," which prevents government entanglement in religion by precluding employment discrimination suits "concerning the employment relationship between a religious institution and its ministers." *Hosanna-Tabor Evangelical Lutheran Church v. EEOC*, ___ U.S. ___ , 132 S. Ct. 694, 705-06 (2012) (recognizing that the Courts of Appeals, including the Fourth Circuit,

---

[2] The Plaintiff's claims are numbered I, II, III, V, VI, VII, and VIII, omitting IV. This Court will refer to each Count as numbered in the Complaint.

have had extensive experience with this issue and have uniformly recognized the ministerial exception).   In *Hosanna-Tabor*, the Supreme Court expressly declined to "adopt a rigid formula for deciding when an employee qualifies as a minister." *Id.* at 707 ("It is enough for us to conclude, in this our first case involving the ministerial exception, that the exception covers [the employee] given all the circumstances of her employment.").

The Court of Appeals for the Fourth Circuit, while similarly eschewing a rigid formula for deciding whether the ministerial exception applies, has employed an individualized, fact-specific "primary duties" test. *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985). Rather than relying on "categorical notions of who is or is not a 'minister,'" the relevant inquiry is whether the function of the position is "important to the spiritual and pastoral mission" of the religious institution. *EEOC v. Roman Catholic Diocese of Raleigh, N.C.*, 213 F.3d 795, 801 (4th Cir. 2000) (music director who was "pivotal figure in most, if not all, aspects of the musical life of the Cathedral and school" was subject to the ministerial exception, barring Title VII suit) (citing *Rayburn*, 772 F.2d at 1168-69); *see also Shaliehsabou v. Hebrew Home of Greater Washington, Inc.*, 363 F.3d 299, 309 (4th Cir. 2004) (kosher supervisor at nursing home who had no formal religious title, but had extensive training in Jewish law and custom, declared himself clergy on tax returns, and had duty to instruct kitchen staff and make decisions regarding compliance with dietary laws was covered by the ministerial exception, barring FLSA claim).

In this case, though BHC is a religious institution, it is plain that the Plaintiff is not one of its ministers.  His primary duties—maintenance, custodial, and janitorial work—were entirely secular.  He has no religious training or title, and had no decision-making authority

with regard to religious matters. The kosher supervisor in *Shaliehsabou* and the music director in *Roman Catholic Diocese of Raleigh*, whose primary duties involved religious matters, stand in stark contrast to the Plaintiff in this case. The only arguably ministerial activity by Davis—when he instructed students in BHC's religious school about the significance of a religious object such as the Sukkah after he set it up—was a limited and infrequent exception to his primary function as Facilities Manager. While these occasional lessons, based on Davis's "limited knowledge,"[3] Davis Dep. 154, may have been enriching to students and to Davis himself, his overall function as Facilities Manager was not "important" to the Defendant's religious mission in the sense contemplated in *Rayburn*, *Roman Catholic Diocese of Raleigh*, and *Shaliehsabou*. In sum, the circumstances of Davis's employment demonstrate that he was not a minister for purposes of the First Amendment. Accordingly, the ministerial exception does not apply in this case, and this Court must consider the substance of the Plaintiff's claims.

## II. Defendant's Motion

In its Motion to Dismiss or, in the Alternative, for Summary Judgment, the Defendant argues for dismissal of Counts II, III, VII, VIII, and for a grant of summary judgment on Counts I, IV, and VI. For the following reasons, this Court will treat the entire Motion as one for summary judgment.

A district court, in its discretion, may consider matters outside the pleadings and thereby convert a motion to dismiss made pursuant to Rule 12(b)(6) into one for summary

---

[3] Davis is not Jewish. Compl. ¶ 14. Although the religious affiliation of the alleged minister is not dispositive, it is a relevant factor in analyzing the circumstances. *See Roman Catholic Diocese of Raleigh*, 213 F.3d at 803-04 (the fact that the replacement music director was not required to be Catholic did not "diminish the spiritual significance of the music ministry role" in practice).

judgment. Fed. R. Civ. P. 12(d); *Hart v. Lew*, ___ F. Supp. 2d ___ , No. ELH-12-3482, 2013 WL 5330581, at *9 (D. Md. Sept. 23, 2013). "Where, as here, the movant expressly captions its motion, 'in the alternative' as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that the conversion under Rule 12(d) may occur; the court 'does not have an obligation to notify parties of the obvious.'" *Hart*, 2013 WL 5330581, at *9 (quoting *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260 (4th Cir. 1998) (plaintiff was on adequate notice when both parties' pleadings referred to the pending "Motion to Dismiss, or, in the alternative, Motion for Summary Judgment," and both parties attached matters outside the pleadings to their briefs)). Indeed, the Plaintiff in this case also attached exhibits outside the pleadings to his Opposition. ECF Nos. 15-2 to 15-8.

Rule 12(d) also requires that, if a Rule 12(b)(6) motion is treated as one for summary judgment under Rule 56, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). While the discovery deadline has not yet expired in this case, ECF No. 9, several depositions have been taken and attached to both parties' submissions, and there has been a reasonable opportunity for discovery. *See* ECF Nos. 14-2, 14-3, 14-5; 15-2, 15-3, 15-7. The Plaintiff has not filed an affidavit pursuant to Rule 56(d) indicating any "specified reasons [he] cannot present facts essential to justify [his] opposition." Fed. R. Civ. P. 56(d); *O'Brien v. Bray*, No. ELH-11-2357, 2012 WL 3745704, at *1 (D. Md. Aug. 28, 2012) (noting that an opposing party "cannot complain that summary judgment was granted without discovery unless that party has . . . [filed] an affidavit or declaration pursuant to Rule 56(d)."). In fact, in his Opposition, the

Plaintiff argues that the Defendant's Motion should be denied because he has "proved" his claims. ECF No. 15-1. The Plaintiff in effect asserts that no further discovery is needed. Thus, analyzing all of his claims under the same standard "is likely to facilitate disposition of the action." *O'Brien*, 2012 WL 3745704, at *1 (citing 5C Wright & Miller, Federal Practice & Procedure § 1366, at 165-67 (3d ed. 2004, 2011 Supp.)). Accordingly, this Court will address BHC's Motion as one for summary judgment as to all Counts.

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249-50. A party opposing summary judgment must "do more than simply show

that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999). This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

## A. Section 1981 & Title VII Claims

### 1. <u>Statute of Limitations</u>

The Defendant argues that certain facts alleged by the Plaintiff may not be considered in the context of his race discrimination claims under 42 U.S.C. § 1981 and Title VII, 42 U.S.C. § 2000e, *et seq.* because they are time-barred. Pursuant to Title VII, a plaintiff generally must file a discrimination charge with the EEOC within 180 days after the alleged unlawful employment practice. *Prelich v. Med. Resources, Inc.*, 813 F. Supp. 2d 654, 661 (D. Md. 2011). That limitations period is extended to 300 days in a "deferral state," "one in which state law proscribes the alleged employment practice and the charge has initially been filed with a state deferral agency." *Id.* (citations and internal quotation marks omitted). As Maryland is a deferral state, Davis was required to file a charge with the EEOC within 300 days of the alleged unlawful employment practice. *Id.* at 661-62. For a § 1981 claim, the statute of limitations is four years. *James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421 (4th Cir. 2004) (citing *Jones v. R.R. Donnelly & Sons, Co.*, 541 U.S. 369 (2004)).

Davis filed his EEOC charge on March 16, 2010. ECF No. 14-1 at 21; ECF No. 15-1 at 7. Accordingly, counting back 300 days from the Plaintiff's EEOC charge filing, the earliest date within the limitations period is May 20, 2009. Thus, only acts by the Defendant

since May 20, 2009, such as Davis's termination on October 5, 2009, can form the basis of his Title VII claim. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."). The Plaintiff alleges that there existed a "plantation" culture at BHC in which maintenance staff was required to serve lunch to the administrative staff, but also acknowledges that the practice ended in 2002. Pl.'s Opp., ECF No. 15-1 at 8. This allegation is time-barred under both Title VII and § 1981.

The Plaintiff also alleges that, between one year and eighteen months before his termination, he once overheard a non-employee congregant refer to African-American employees as "darkies." Compl. ¶ 14; Davis Dep. 260-61. This allegation is time-barred under *Morgan*, 536 U.S. at 113, for purposes of Title VII because it did not take place within 300 days of the filing of Davis's EEOC charge. It may, however, be considered in the context of the § 1981 claim.

In his Opposition, the Plaintiff argues that all acts alleged in his Complaint are actionable because they were part of a hostile work environment. He has failed to connect the allegations concerning serving lunch to administrative staff and the name-calling incident to his discharge or any other allegedly discriminatory acts to show the level of pervasive conduct necessary to establish a hostile work environment claim. *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009) (recognizing that "plaintiffs must clear a high bar in order to satisfy the severe or pervasive test" and must show that the environment was "pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate") (citations and internal quotation marks omitted); *see also Morgan*, 536 U.S. at 114 ("While [the plaintiff]

alleged that he suffered from numerous discriminatory and retaliatory acts from the date he was hired through [ ] the date he was fired, only incidents that took place within the timely filing period are actionable."). The Plaintiff likewise has not made any argument that the limitations period should be tolled or extended on equitable grounds, and this Court concludes that no grounds exist to do so. *Id.* Accordingly, this Court analyzes the Plaintiff's claims of race discrimination only on the basis of his timely-made allegations.

2. McDonnell Douglas Framework

In a Title VII case such as this, where the record contains no direct evidence of discrimination, a plaintiff's claims must be analyzed under the burden-shifting scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This framework is also used to evaluate race discrimination claims under § 1981. *Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir. 2004). Under *McDonnell Douglas*, the plaintiff must first make out a prima facie case that the defendant acted with discriminatory intent. *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir. 1998). To establish a prima facie case of discrimination, a plaintiff must demonstrate: (1) membership in a protected class; (2) an adverse employment action; (3) performance of job duties at a level that met the employer's legitimate expectations; and (4) that the position remained open or was filled by similarly qualified applicants outside the protected class. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc). If a prima facie case is established, the burden of production shifts to the defendant to offer a legitimate, nondiscriminatory reason for its adverse employment action. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996). If the employer fulfills this burden of production, the burden reverts back to the plaintiff to establish that the

defendant's proffered reason is pretextual and that his termination was instead motivated by discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993). "At this point, the burden to demonstrate pretext 'merges with the ultimate burden of persuading the court that the plaintiff has been the victim of intentional discrimination.'" *Hill*, 354 F.3d at 285 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

While the Plaintiff is in the protected class of African-Americans and he suffered the adverse employment action of being terminated, he has failed to meet the other two elements of a prima facie case. Davis acknowledges that his job performance was unsatisfactory, including that he failed to address facilities issues that were his responsibility. Davis Dep. 196-203. In addition, while he alleges that BHC "wanted to fill his position with a White/Jewish person," this allegation is based only on Davis's assumption the Defendant did so. Davis testified that he "assumed" that he was replaced with an unidentified individual who was working at BHC before Davis was terminated. Davis Dep. 237-38. Windman testified that Davis's replacement, Mark Hucks, was not interviewed or hired until after Davis was fired, and the Plaintiff cites no evidence as to Hucks's race or religion. Windman Dep. 56-57. The Plaintiff's conclusory allegations cannot create a genuine issue of material fact on this point.

Moreover, even if Davis could make a prima facie case, he cannot meet his ultimate burden to prove that he has been the victim of intentional discrimination. He concedes that he was terminated for legitimate non-discriminatory reasons. ECF No. 15-1 at 8. Thus, the burden shifts back to him to show that those reasons were merely a pretext for a discriminatory purpose. *St. Mary's Honor Ctr.*, 509 U.S. at 508. Davis has provided no

evidence to rebut the legitimate reasons that BHC stated for discharging him. His allegation of overhearing the non-employee congregant use a racial slur, which is time-barred for Title VII consideration, holds no sway under § 1981 either. This single isolated incident involving a non-employee congregant of the BHC does not satisfy the Plaintiff's burden of showing pretext under the principles of *McDonnell Douglas*. Similarly, Davis's conclusory allegation that African-American employees were treated differently with regard to vacation time is unsupported by any evidence. Accordingly, there are no genuine issues of material fact as to the Plaintiff's race discrimination claims under § 1981 in Count I and under Title VII in Count IV, and the Defendant is entitled to summary judgment as a matter of law.

## B. Section 1983 Claim

In Count II, the Plaintiff asserts a claim pursuant to 42 U.S.C. § 1983 for a deprivation of equal protection of the laws under the Fourteenth Amendment. Section 1983 prohibits "state action" or "action under color of state law" that deprives Constitutional or federal statutory rights. *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180-81 (4th Cir. 2009) ("It has been observed that 'merely private conduct, no matter how discriminatory or wrongful,' fails to qualify as state action." (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999))). There is no allegation that BHC is a state actor or acts in any way under color of state law. Indeed, the Plaintiff concedes in his Opposition that BHC is not liable under § 1983. Therefore, summary judgment is granted in favor of the Defendant as to Count II.

## C. Section 1982 Claim

In Count III, the Plaintiff asserts that the Defendant discriminated on the basis of

race with regard to a property interest in his employment with BHC, in violation of 42 U.S.C. § 1982. Section 1982 of Title 42 states that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. Section 1982 was enacted through the Civil Rights Acts of 1866 and 1870, to enable enforcement of the Thirteenth and Fourteenth Amendments to the Constitution. *Evans v. Chesapeake & Potomac Tel. Co. of Md.*, 535 F. Supp. 499, 505-06 (D. Md. 1982). However, the Constitution does not create property interests, but rather protects interests in property that "are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). There is no property right in an employment position unless the employee has a "legitimate claim of entitlement" to his job. *Prince v. Bridges*, 537 F.2d 1269, 1271 (4th Cir. 1976) (analyzing a § 1982 claim in relation to due process rights under the Fourteenth Amendment (quoting *Bd. of Regents of State Colleges*, 408 U.S. at 577)). An employee may have a legitimate claim of entitlement when "contractual or statutory provisions guarantee continued employment." *Id.*; *see also Wagner v. Gibson*, WDQ-12-3581, 2013 WL 4775380, at *6 (D. Md. Sept. 4, 2013) (county employee who could only be terminated for just cause had a protected property interest in continued employment, in context of a substantive due process claim).[4]

   In this case, Davis was an "at will" employee who could be terminated at any time

---

[4] While the cited cases concerned alleged property interests in public employment, there appears to be no reason for the standard to be different for a private employee. Other courts that have directly analyzed this question have held that there is no protected property interest in private employment. *See, e.g.*, *Schirmer v. Eastman Kodak Co.*, No. 86-3533, 1987 WL 9280, at *4 (E.D. Pa. Apr. 9, 1987).

with or without cause. Balt. Hebrew Congregation Employee Handbook, ECF No. 1-3 at 19. Because he had no guarantee of continued employment, and thus no property interest protected under § 1982, his claim fails as a matter of law.[5] Accordingly, summary judgment is granted in the Defendant's favor on Count III.

### D. Americans with Disabilities Act Claim

The Plaintiff alleges in Count VI that the Defendant violated the Americans with Disabilities Act by discharging him on the basis of disability and failing to make reasonable accommodations. Under either theory, the Plaintiff's claim fails.

To establish a prima facie case of disparate treatment based on discriminatory discharge under the ADA, a plaintiff must show that (1) he was a qualified individual with a disability; (2) he was discharged; (3) he was fulfilling his employer's legitimate expectations at the time of discharge; and (4) the circumstances of his discharge raise a reasonable inference of unlawful discrimination. *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 272 n.9 (4th Cir. 2004) (citation omitted). The Defendant argues that the Plaintiff is not a qualified individual with a disability, and thus is not covered by the ADA. The Plaintiff counters that he had disabling back pain that limited his ability to work such that he is ADA-qualified. Even assuming that there is a genuine issue of material fact on this point, the Plaintiff cannot establish the third and fourth elements of a prima facie case. At the time of his termination, Davis was not meeting legitimate work expectations due to issues unrelated to any alleged disability, such as failing to communicate regarding projects and disrespecting his coworkers.

---

[5] Moreover, the Plaintiff has failed to raise a genuine issue of material fact as to whether BHC acted with any discriminatory animus, which is required to survive summary judgment on a § 1982 claim. *Antonio v. Security Servs. of Am., LLC*, 701 F. Supp. 2d 749, 772 (D. Md. 2010).

Compl. Ex. 1, ECF No. 1-1. The Plaintiff concedes that BHC had legitimate non-discriminatory reasons to terminate him. Pl.'s Opp., ECF No. 15-1 at 8; Davis Dep. 196-201. The overall circumstances of his discharge do not give rise to any reasonable inference of discrimination based on disability. Thus, the Plaintiff cannot make a prima facie case of disparate treatment.

To establish a prima facie failure to accommodate claim, a plaintiff must show that: (1) he was a qualified individual with a disability; (2) the employer had notice of his disability; (3) with the reasonable accommodation he could perform the essential functions of his position; and (4) that the employer refused to make such accommodation. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (citation omitted). Again, even assuming that a genuine issue of material facts exists as to whether the Plaintiff is a qualified individual with a disability, and as to whether his alleged request for accommodations after his back injury in April 2009 gave BHC notice of a disability, he cannot make a prima facie case for two reasons. First, while the Plaintiff's doctor's note advised him to be on "light duty," Davis, as the Facilities Manager, had the ability to limit himself to light work. Davis Dep. 55-58. He had the ability to assign himself any work, assign other work to other employees, and to work with the scheduler to ensure that another employee would be present when he needed assistance on projects. *Id.* at 38-39; Rahming Dep. 13-14. In that regard, the accommodation of limiting Davis's duties to light work was already permitted in light of his supervisory position.

Second, this Court has previously noted that the Americans with Disabilities Act "does not require an employer to hire an additional person to perform an essential function

of a disabled employee's position." *See Wyatt v. Md. Inst.*, No. RDB-10-2584, 2012 WL 739096, at *8 (D. Md. Mar. 7, 2012) (citing *Lusby v. Metro. Wash. Airports Auth.*, 187 F.3d 630 (Table), 1999 WL 595355, at *16 (4th Cir. Aug. 9, 1999) (per curiam)). Accordingly, the Plaintiff's alleged request to the Defendant that another employee be scheduled to work with him at all times was unreasonable. *Id.* at 57-58. Even giving credence to the Plaintiff's claim that BHC refused his request to always have the help of another employee by failing to adequately staff the maintenance department, Davis Dep. 56-58; Compl. ¶ 8, the only way to fulfill this accommodation would have been to hire additional workers. In sum, the Plaintiff cannot establish a prima facie ADA claim in Count VI, and accordingly summary judgment is granted in favor of the Defendant.

### E. Breach of Contract Claim

In Count VII, the Plaintiff asserts a state law claim for breach of contract based on violations of the terms of the Employee Handbook. This Court has supplemental jurisdiction over the Plaintiff's state law claims because they "form part of the same case or controversy" as his federal law claims. 28 U.S.C. § 1367. A breach of contract action requires a contractual obligation in the first instance. *Chubb & Son v. C7C Complete Servs., LLC*, 919 F. Supp. 2d 666, 678 (D. Md. 2013). No such contractual obligation exists here. As discussed above, the Employee Handbook made clear that the Plaintiff was an "at will" employee, ECF No. 1-3 at 19, and Davis acknowledges that he could be terminated without a reason. Davis Dep. at 90. Likewise, the Handbook stated that it "is not intended to be, not is it, a 'contract' with any of BHC's employees. No Provision shall be deemed 'contractual.' No one is authorized to represent otherwise." ECF No. 1-3 at 3. "'[A]n

employer may avoid contractual liability by any terms which clearly and conspicuously disclaim contractual intent.'" *Scott v. Merck & Co.*, 497 F. App'x 331, 335 (4th Cir. 2012) (unpublished) (quoting *Castiglione v. Johns Hopkins Hosp.*, 517 A.2d 786, 793 (Md. Ct. Spec. App. 1986)). Because Davis was an "at will" employee and BHC expressly disclaimed any contractual intent in the terms of the Employee Handbook, there is no contract between the parties. Thus, the Defendant is entitled to judgment as a matter of law on the breach of contract claim in Count VII.

### F. Wrongful Discharge Claim

In Count VIII, the Plaintiff asserts a claim for the tort of wrongful discharge. The Plaintiff incorporates the allegations contained in the rest of the Complaint, but does not refer to any statute or other source of law that he alleges has been violated. *Adler v. Am. Standard Corp.*, 432 A.2d 464, 472 (Md. 1981) (holding that a plaintiff must plead and show that the alleged conduct violated a specific statutory provision, rule of law, or declared mandate of public policy to maintain a wrongful discharge claim). To the extent that the Plaintiff suggests in his Opposition that his wrongful discharge claim in Count VIII refers to race and disability discrimination, ECF No. 15-1 at 11, the Plaintiff already pled those claims under Title VII and the ADA. Under Maryland law, no state law tort claim for wrongful discharge can lie if a statute provides a remedy. *Elkins v. Pharm. Corp. of Am.*, 217 F.3d 838 (Table), 2000 U.S. App. LEXIS 16002, at *4 (4th Cir. July 12, 2000) (per curiam) (citing *Parlato v. Abbott Labs.*, 850 F.3d 203, 206-07 (4th Cir. 1988) and *Makovi v. Sherwin-Williams Co.*, 561 A.2d 179, 190 (Md. App. 1989)). Accordingly, Davis cannot as a matter of law state a separate tort claim for wrongful discharge based on race or disability discrimination.

The Plaintiff's claim in Count VIII could also be construed as alleging wrongful discharge in retaliation for filing a Workers' Compensation claim, in contravention of a clear mandate of Maryland public policy. *Munoz v. Balt. Cnty., Md.*, No. RDB-11-2693, 2012 WL 3038602, at *13 (D. Md. July 25, 2012) (citations omitted). Under this interpretation, his wrongful discharge claim still fails as a matter of law. A tort cause of action may lie under Md. Code Ann., Lab. & Empl. § 9-1105 if an employee was "discharged solely and directly because of filing a workers' compensation claim." *Id.* (alterations omitted) (citing *Muench v. Alliant Foodservice, Inc.*, 205 F. Supp. 2d 498, 504 (D. Md. 2002) and *Kern v. S. Balt. Gen. Hosp.*, 504 A.2d 1154, 1159 (Md. App. 1986)). In this case, the Plaintiff concedes that the Defendant terminated him for legitimate non-discriminatory reasons, namely that his job performance was poor. Pl.'s Opp., ECF No. 15-1 at 8; Davis Dep. 196-201, ECF No. 14-1 Ex. 1. Even if there was a genuine issue of material fact as to whether the filing of a Workers' Compensation claim played any part in the discharge decision, Davis cannot show that it was the sole and direct reason, as required by statute and clear Maryland case law. *See, e.g., Kern*, 504 A.2d at 1159. For those reasons, the Defendant is entitled to summary judgment as to the state law wrongful discharge claim in Count VIII.

### G. Attorneys' Fees and Costs

Finally, the Defendant moves for an award of attorneys' fees and costs pursuant to Title VII, 42 U.S.C. § 2000e-5(k), and the ADA, 42 U.S.C. § 12205. "[A] district court may in its discretion award attorneys' fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Christianburg Garment Co. v. EEOC*, 434 U.S.

412, 421 (1978); *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1190 (9th Cir. 2001) (applying the standard announced in *Christianbug Garment Co.* to ADA claim).  While the Plaintiff was unsuccessful in his claims under Title VII and the ADA, this Court cannot conclude in hindsight that the claims were so devoid of foundation that to bring suit at all was frivolous. *Christianburg Garment Co.*, 434 U.S. at 422.  Accordingly, the Defendant's request for an award of attorneys' fees and costs is denied.

<u>CONCLUSION</u>

For the reasons stated above, the Defendant's Motion for Summary Judgment as a matter of law (ECF No. 14) is GRANTED, and the Defendant's request for attorneys' fees and costs is denied.

A separate Order follows.

Dated:  November 27, 2013                                  _____/s/_____
                                                                              Richard D. Bennett
                                                                              United States District Judge